STATE of Wisconsin EX REL. GODFREY & KAHN, S.C.,
Petitioner,

v.

CIRCUIT COURT FOR MILWAUKEE COUNTY,
Honorable Dennis J. Flynn Reserve Judge,
Christopher I. Stone and Midwest AirGroup, Inc.,
Respondents.

Court of Appeals

*No. 2011AP921–W. Oral argument May 21, 2012.
—Decided October 10, 2012.*

2012 WI App 120

(Also reported in 823 N.W.2d 816.)

On behalf of the petitioner, the cause was submitted on the briefs of *Thomas L. Shriner, Jr.* and *Eric G. Pearson of Foley & Lardner LLP*, Milwaukee. There was oral argument by *Thomas L. Shriner, Jr.*

On behalf of the respondent, *Chistopher I. Stone*, the cause was submitted on the brief of *Steven E. Kravit, Mark M. Leitner* and *Aaron H. Aizenberg* of *Kravit Hovel & Krawczyk, S.C.*, Milwaukee. There was oral argument by *Arron H. Aizenberg*.

There also was oral argument on behalf of the *Honorable Dennis J. Flynn*, by *David C. Rice*.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. BRENNAN, J. Godfrey & Kahn, S.C., petitions for a supervisory writ of prohibition, pursuant to

Wis. Stat. § 809.51 (2009–10),[1] to prevent the trial court, Reserve Judge Dennis J. Flynn presiding, from signing and entering a judgment against Godfrey & Kahn for legal bills and costs in *Stone v. Midwest Air Group, Inc.*, Milwaukee County Circuit Court Case No. 2008CV15335. In an oral ruling at a post-verdict motion hearing, the trial court, *sua sponte*, invoked its inherent authority and said that it was sanctioning Godfrey & Kahn, the law firm representing Midwest Air Group, Inc., "in the exercise of its discretion under case law and statutory law, and to penalize the conduct disruptive to the administration of justice."

¶ 2. Godfrey & Kahn argues that a writ of prohibition is necessary because the basis for the trial court's sanction was the law firm's *pre*-litigation legal advice, which is not a permissible basis for the exercise of inherent power, especially where, as here, the law firm was never given notice or an opportunity to be heard prior to the sanction. Christopher Stone, the party whose legal costs and fees Godfrey & Kahn was ordered to pay, argues that the writ should not issue because the trial court's sanction was imposed, not for Godfrey & Kahn's pre-litigation conduct, but for its trial strategy, which is a permissible basis for the trial court's exercise of inherent authority.

¶ 3. We conclude that the record, particularly the trial court's own words in its ruling, clearly shows that the trial court imposed the sanction for pre-litigation legal advice that the trial court believed Godfrey & Kahn had given to its client, Midwest. And while it is well-established law in Wisconsin that trial courts have broad

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version.

inherent powers to enable them to function as courts, *see State v. Cannon*, 196 Wis. 534, 536, 221 N.W. 603 (1928) ("Such powers have been conceded because without them [courts] could neither maintain their dignity, transact their business, nor accomplish the purposes of their existence."), neither party cites to any legal authority justifying the exercise of inherent powers to sanction for pre-litigation legal advice, nor could we find any. Rather, the test for whether a court can invoke its inherent power to sanction is whether such action is necessary for the court to properly function. *See State v. Braunsdorf*, 98 Wis. 2d 569, 580, 297 N.W.2d 808 (1980) ("These cases teach that an inherent power is one without which a court cannot properly function."); *see also Jacobson v. Avestruz*, 81 Wis. 2d 240, 245–46, 260 N.W.2d 267 (1977) (" 'The general control of the judicial business *before it* is essential to the court if it is to function.' ") (emphasis added; citation omitted).

¶ 4. Here, the pre-litigation legal advice on which the trial court based its sanction did not occur in the presence of the trial court, nor did it impede the trial court's ability to function as a court. *See id.* Indeed, the trial had been completed, and the verdicts had been rendered and affirmed by the time the trial court imposed the sanction. Thus, we conclude that the trial court lacked a legal basis for invoking its inherent powers and issuing the sanction.

¶ 5. Finally, we conclude that a writ of prohibition, while a drastic remedy that should be used with caution, is appropriate here because the trial court lacked authority for the sanction and no other appellate remedy is realistically available to Godfrey & Kahn. As such, we grant the petition for a supervisory writ of prohibition and thereby prohibit the circuit court from entering judgment against Godfrey & Kahn for the opposing party's legal bills and costs.

## BACKGROUND

¶ 6. In order to properly address Godfrey & Kahn's petition for a writ of prohibition, we need to examine some of the facts underlying *Stone*, and the procedural history of that case leading up to the trial court's ruling that Godfrey & Kahn was responsible for the opposing party's attorney's fees. We set forth those facts here.

¶ 7. In October 2008, Stone sued Midwest for breach of his employment contract (otherwise known as the Key Executive Employment and Severance Agreement or "KEESA") and breach of the implied duty of good faith and fair dealing. Godfrey & Kahn was not and never has been a party to that action; rather, Godfrey & Kahn represented Midwest. Due to judicial rotations and illness, several trial court judges presided over pretrial discovery and dispositive motions. Judge Flynn was assigned to the case on the eve of trial in February 2011.

¶ 8. In March 2011, the matter went to trial. The trial revealed the following facts concerning Stone's termination that are pertinent to Godfrey & Kahn's petition.

¶ 9. On May 30, 2008, Timothy Hoeksema, Midwest's chief executive officer, met with Stone and told him that "based on performance, it was time that we talked about him leaving Midwest." Hoeksema planned to meet with Stone again the following week to discuss the "specifics," including Stone's severance package. Before the second meeting, Hoeksema became concerned about reports that Stone had sexually harassed several female employees. As such, when Hoeksema met with Stone again on June 3, 2008, he informed Stone that Midwest would be investigating the reported conduct. Hoeksema testified at trial that Midwest engaged Godfrey & Kahn on June 3, 2008.

¶ 10. Midwest conducted an internal investigation, and Stone was interviewed, on July 23, 2008, about the complaints against him. On July 25, 2008, via email, Hoeksema advised Stone that the "details of the investigation were provided to [Midwest's] outside counsel [Godfrey & Kahn]. They have [sic] advised that sufficient evidence exists for [Midwest's] Board of Directors to consider whether to terminate you for 'cause' in accordance with the terms of your KEESA." In addition, the email notified Stone that if he had any written materials he wanted the Board to consider, he must submit them by July 30, 2008.

¶ 11. Thereafter, on July 28, 2008, Midwest sent Stone a formal notice that the issue of whether to terminate him for cause would be considered at the Board's August 4, 2008 meeting. Immediately after receiving the notice, in anticipation of the August 4 Board meeting, Stone emailed Midwest's in-house counsel, David Sislowski, requesting "copies of any documentation that is being sent by [Midwest] to our Board members in anticipation of this meeting . . . . This includes any documents prepared by [Godfrey & Kahn] justifying their [sic] recommendation of termination for cause." The next day Stone emailed Sislowski again, on the advice of his attorney, reminding Sislowski to send "all of the notes and documents that were part of [Midwest's] investigation, and which led to [its] questions . . . in the investigatory interview."

¶ 12. The following day, on July 30, 2008, in compliance with the deadline set by Midwest for submission of his defensive materials, and despite the fact that he had not yet received any discovery from Midwest, Stone submitted a letter to the Board vigorously denying that he had engaged in any conduct that would justify his termination for cause. In the letter, Stone generally denied that he had engaged in any inappro-

priate conduct, and asked the Board to refer to the responses to the accusations that he had given to the investigator in his July 23 interview.

¶ 13. In a July 31, 2008 letter, Attorney Michael D. Huitink, an attorney with Godfrey & Kahn, informed Stone's lawyer that Midwest would not be turning over *all* the notes and documents relating to its investigation of the allegations made against Stone because "nowhere does the KEESA require Midwest to turnover [sic] such documents. Moreover, Midwest has serious concerns about inappropriate disclosure or retaliation against its employees that may occur if it turns over such documentation to Mr. Stone." Nonetheless, the letter further stated that Midwest would provide Stone with the Final Investigation Report, which would be considered by the Board, provided that Stone agreed, by signing and returning the letter, that: (1) the report would only be reviewed by Stone and his lawyer; (2) Stone and his lawyer would not duplicate or disseminate the report; and (3) Stone would not retaliate against or contact any of the complainants.

¶ 14. The record appears to be silent on whether Stone signed the release letter,[2] but, nonetheless, on August 1, 2008, Attorney Huitink sent Stone and his attorney a copy of the Final Investigation Report. The eight-page Final Investigation Report set forth twelve allegations of sexual harassment and summarized Stone's responses to each allegation during his July 23 interview.

¶ 15. In preparation for the August 4 Board meeting, Board members were provided with a copy of the

[2] The parties imply in their briefs that Stone did sign the release letter, but we cannot locate any such letter in the record and the parties do not provide us with a record cite in support of that proposition.

618

Final Investigation Report, Stone's July 30 denial letter, and a confidential memorandum prepared by Godfrey & Kahn. The confidential memorandum is not part of the record. The Midwest investigator was available at the meeting to answer the Board's questions about her report, and both Stone and his attorney were given an opportunity to give statements. Stone chose not to individually address each of the twelve allegations set forth in the Final Investigation Report, despite receiving a copy of the report three days prior to the Board meeting. None of the complainants were present. The Board voted unanimously to terminate Stone for "[c]ause" because of "a pattern of . . . inappropriate conduct" with female employees.

¶ 16. Subsequently, Stone sued Midwest for wrongful termination. Stone attempted to show the jury at the March 2011 trial that Midwest breached the KEESA and its duty of good faith and fair dealing in terminating him. The breach-of-good-faith claim was premised on Stone's contention that Midwest had not given him *all* of the notes and reports prepared by the investigator prior to the August 4 Board meeting, and that therefore, he was unable to properly defend himself. He acknowledged receiving a copy of the Final Investigation Report, setting forth the twelve allegations of misconduct, but asserted that he was denied a copy of the Interview Summaries, a longer version of the Final Investigation Report.

¶ 17. During Stone's direct examination at trial, he addressed each of the twelve allegations of sexual harassment set forth in the Final Investigation Report, rebutting each one in turn. On cross-examination, Midwest, through its counsel, Attorney Huitink of Godfrey & Kahn, asked Stone why he failed to individually address each of the twelve allegations at the August 4 Board

meeting like he did at trial, and suggested that Stone *strategically* chose not to address each of the allegations at the August 4 Board meeting because he wanted to avoid Midwest calling each complainant in to testify before the Board.

¶ 18. Stone's attorney objected to this line of questioning, and after the jury was excused, the trial court heard argument. Stone's attorney stated that the basis for his objection was that he believed Attorney Huitink was trying to get inadmissible evidence before the jury, namely, the Interview Summaries, which were not before the Board at the August 4 Board meeting and which the trial court had previously ruled were inadmissible. In response, Attorney Huitink denied that it was his intent to open the door to the Interview Summaries. Rather, he argued that he was simply seeking to elicit Stone's confirmation that the choice *not* to rebut the twelve allegations in the Final Investigation Report at the August 4 Board meeting was strategic and designed to prevent the complaining witnesses from being called to testify. Attorney Huitink argued that this rebuttal to Stone's testimony addressing each of the twelve allegations set forth in the Final Investigation Report was fair and necessary because Midwest was not permitted to call each complaining witness at trial.

¶ 19. The trial court sustained Stone's objection, saying:

> [T]he defendant is trying to suggest to the jury in a totally convoluted manner, that it is the plaintiff who is responsible for this board of directors not having before it whatever the number of these victims, alleged victims were.
>
> That is wrong, and that would be a total mis-use [sic] of the court system to allow that to be. In this case, and the rulings stand, this jury is going to review what the board reviewed. Nothing more, nothing less.

¶ 20. In the process of making that ruling, the trial court also said that Midwest, through its attorneys at Godfrey & Kahn, was "not just crossing the line, but going a hundred miles beyond the line" because the trial court believed that Godfrey & Kahn improperly "chose not to give to [Stone], the information it had relative to the charges against him" prior to the August 4 Board meeting. The trial court, calling Godfrey & Kahn's actions prior to the August 4 Board meeting "almost Kafkaesque,"[3] characterized the refusal to give Stone a copy of the Final Investigation Report unless he agreed to confidentiality terms, as putting "a gun to the head of the plaintiff." Additionally, the trial court faulted Midwest for saying, incorrectly according to the court, that the KEESA did not require Midwest to give Stone the longer report, to wit, a copy of the Interview Summaries. After the objection was sustained, trial continued.

¶ 21. Following closing statements, the case was handed over to the jury. The jury found that Midwest did not breach the KEESA but that it had breached the duty of good faith and fair dealing, and awarded Stone $405,000 in damages.

¶ 22. Addressing the parties' motions after the verdicts, the trial court affirmed the jury's verdicts, but then the court, *sua sponte*, found that the breach of good faith was not created by Midwest, but by Godfrey & Kahn through its legal advice to Midwest prior to the August 4 Board meeting:

---

[3] Franz Kafka was an "Austrian writer whose stories and novels . . . concern troubled individuals in a nightmarishly impersonal world." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 980 (3d ed. 1992). The adjective "Kafkaesque" has been used to describe things which are "characteristic of Franz Kafka or his writings," that is, things "[c]haracterized by surreal distortion and usually by a sense of impending danger." *Id.*

[I]t was Midwest but acting through its legal agent, Godfrey & Kahn, that acted unfairly and in true bad faith. If ever in the history of Wisconsin, there was a bad faith case, this is the bad faith case.

And, again, this wasn't something Midwest created. Midwest went to its law firm to get good, solid advice on the law. The law firm, . . . Godfrey & Kahn, not through one or two attorneys, but through a bevy of attorneys, engaged in a systematic denial to plaintiff of plaintiff's right under the contract, not getting into equal protection, the rights under the contract to fundamental fairness.[4]

¶ 23. In support of its finding, the trial court pointed to the July 31 letter Attorney Huitink sent to Stone's lawyer, informing him that Midwest would not be turning over to Stone all of the documents he requested. The trial court stated:

To require that someone respond without even knowing the charges, to deny a person an ability to see the documents that indicate misconduct, to deny the accused person the ability, not just to contact, have an investigator contact those persons, but an ability to bring those persons before the board. [sic]

¶ 24. In short, the trial court attributed Midwest's bad faith to Godfrey & Kahn, stating that: "Once [Godfrey & Kahn] became involved with these requirements, the law firm acted as an obstacle to truth. We have no knowledge of anyone in [Midwest] being involved in the decisions that were made in this regard other than the law firm." The trial court also found that Godfrey & Kahn's decision not to turn over all of the discovery to Stone was contrary to the law, stating that

---

[4] We note that the trial court's comments came after the jury found that Midwest had not breached the terms of the KEESA.

both the KEESA and Wisconsin's law of good faith and fair dealing required the documents to be turned over.

¶ 25. The trial court then ordered Godfrey & Kahn to pay all of Stone's legal bills and his costs, stating:

> Next, the Court orders, in the exercise of its discretion under case law and statutory law, and to penalize the conduct disruptive to the administration of justice in this case, that Godfrey & Kahn, SC, counsel and agent for Midwest, be fully and totally responsible for paying all of [Stone's] legal bills and his costs.
>
> It was the law firm that egregiously and intentionally, and without any sound legal basis, established the Kafkaesque procedures for Midwest's termination of [Stone] for cause under the KEESA contact.
>
> It's not just a question of looking at an issue and coming up with the wrong decision. Every human being can make a wrong decision. But this was intentional. It was strategic. It was totally under the control of Godfrey & Kahn, and it is truly outrageous.
>
> The procedure denied to [Stone] any semblance of fundamental fairness under the KEESA contract, and we're not dealing again with due process, his rights under the contract.
>
> He never received reasonable notice, absolute denial of his right to reasonable notice. And he never received an opportunity, a fair opportunity, to be heard at the board meeting.
>
> Again the board members thought they had everything that was to be presented. They relied on their attorneys, their law firm — I want to make it clear, it's their entire law firm — in terms of the actions they took.
>
> The credible evidence and reasonable inferences established that the Midwest Board relied on the law firm of Godfrey & Kahn in terms of legal advice relative to the KEESA and [its] interactions with the plaintiff, Mr. Stone.

The procedure that was devised by Godfrey & Kahn was Machiavellian.[5] It was contrary to the plaintiff's KEESA rights. It was contrary to fundamental fairness. And it was knowingly devised by the Godfrey & Kahn [l]aw [f]irm to benefit the law firm, to benefit Midwest, and to harm [Stone], and in the process to ignore Wisconsin law in terms of good faith and fair dealing with respect to a contact.

¶ 26. Before the trial court was able to memorialize its oral ruling in writing, Godfrey & Kahn filed, on its own behalf, the petition for a supervisory writ of prohibition that is currently pending before this court, and simultaneously asked us to prohibit the trial court from signing and entering judgment against it in the underlying case. To ensure that the issues raised by Godfrey & Kahn were not rendered moot, we issued a temporary order barring the trial court from entering a judgment for legal fees against Godfrey & Kahn. The order also directed the parties to file responses to Godfrey & Kahn's petition.

¶ 27. After receiving the parties' responses to the petition, we issued a second order, continuing the temporary stay and remanding with directions that the trial court conduct a hearing to afford Godfrey & Kahn an opportunity to present evidence and argument on the propriety of the sanction against it. Godfrey & Kahn immediately moved for reconsideration of our remand order, citing judicial bias and ethical considerations

[5] Niccolò Machiavelli was an "Italian political theorist whose book *The Prince* (1513) describes the achievement and maintenance of power by a determined ruler indifferent to moral considerations." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1076. The adjective "Machiavellian" is used to describe a thing "characterized by expediency, deceit, and cunning." *Id.*

concerning its representation of Midwest. Godfrey & Kahn noted that the only way it could defend itself on remand against the trial court's charge would be to "offer[] evidence that is confidential to Midwest and protected by the attorney-client privilege and the work-product doctrine, something it may not do," and that remand could create conflict issues that may deprive Midwest of its counsel of choice.

¶ 28. Having considered Godfrey & Kahn's motion for reconsideration, we entered a third order, continuing the temporary stay barring the trial court from entering a judgment for costs but vacating the remand order. The order imposing the temporary stay currently stands, and a judgment against Godfrey & Kahn has not been entered.

¶ 29. In May 2012, we heard oral argument on the petition for a supervisory writ of prohibition. The parties advised us at oral argument and in Stone's response brief that although Midwest initially filed a notice of appeal in the underlying case, the appeal has been dismissed and the underlying case is concluded.

## DISCUSSION

¶ 30. Godfrey & Kahn's petition for a supervisory writ of prohibition asks us to bar the trial court from entering a judgment against it for Stone's attorney's fees and costs. As grounds, Godfrey & Kahn contends that a judgment against it, based on its supposed pre-litigation conduct, exceeds the trial court's jurisdiction[6] and authority and, in this case, violates due process. In response, Stone contends that the trial court

---

[6] Godfrey & Kahn argues that the trial court lacked personal jurisdiction over the law firm because "[n]o summons or other process was ever issued here that would have permitted the [trial] court to acquire personal jurisdiction over Godfrey &

did not sanction Godfrey & Kahn for its pre-litigation conduct, but rather for misconduct during trial that disrupted the administration of justice, and that the trial court has the inherent authority to sanction Godfrey & Kahn for that conduct. The attorney general, representing Milwaukee County Circuit Court and Judge Flynn, argues only that Godfrey & Kahn is not entitled to a supervisory writ of prohibition because it has an adequate remedy by appeal.

¶ 31. We conclude that: (1) the record shows that the trial court sanctioned Godfrey & Kahn for pre-litigation legal advice that the trial court believed the law firm gave to Midwest; (2) the trial court did not have the inherent authority to sanction Godfrey & Kahn for its pre-litigation conduct because the conduct did not occur before the trial court or impede the functioning of the trial court; and (3) a writ of prohibition is necessary and appropriate under the unique circumstances of this case.

## I. The record shows that the trial court's sanction was for pre-litigation legal advice that the trial court believed Godfrey & Kahn gave to Midwest.

■

¶ 32. Stone contends that the trial court properly sanctioned Godfrey & Kahn for its actions at trial, as opposed to pre-litigation legal advice that the trial court believed Godfrey & Kahn gave to Midwest. Thus, Stone argues that the trial court properly invoked its inherent authority when it sanctioned Godfrey & Kahn because

Kahn for matters predating the underlying litigation." We do not reach the personal jurisdiction and due process arguments because we resolve the case on the lack of inherent authority grounds. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.,* 2005 WI App 190, ¶ 8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707.

Wisconsin law recognizes that the trial court has inherent power to sanction for trial conduct that is "disruptive to the administration of justice." *See Jensen v. McPherson*, 2004 WI App 145, ¶ 35, 275 Wis. 2d 604, 685 N.W.2d 603 (discussing a trial court's inherent authority to impose costs when necessary to penalize conduct " 'disruptive to the administration of justice' ") (citation omitted).

¶ 33. The transcript of the trial court's ruling, however, belies Stone's argument that the sanction was for Godfrey & Kahn's trial conduct because it shows that the trial court never mentioned Godfrey & Kahn's trial strategy or trial conduct at any point. Rather, when justifying its sanction, the trial court focused exclusively on what it believed to be Godfrey & Kahn's pre-litigation legal advice to Midwest.

¶ 34. In its oral ruling, the trial court determined that Midwest's bad faith was actually caused by Godfrey & Kahn's supposed pre-litigation legal advice, saying that the jury's verdict against Midwest "focused . . . on the [termination] procedure that was utilized, and that was a procedure where the architect, in all respects, was the law firm of Godfrey & Kahn." The trial court concluded that after Godfrey & Kahn became involved with Stone's termination it "acted as an obstacle to truth" by refusing to disclose the Final Investigation Report unless Stone agreed on a number of conditions, preventing both Stone and the Board from accessing the Interview Summaries, and falsely (according to the trial court) representing that Midwest was not required to turn over all of the investigator's notes to Stone under the terms of the KEESA.

¶ 35. Throughout its ruling, the trial court referred only to Godfrey & Kahn's pre-litigation legal advice to Midwest, stating:

627

And the law firm initially said that certain data could not be given over to [Stone] . . . .

Now, that was not just false, that was absolutely false. Because in addition to the language in the contract, under Wisconsin law, there is a good faith and fair dealing clause imputed into every contract in the State of Wisconsin and, of course, [Godfrey & Kahn] knew that.

[Godfrey & Kahn] disregarded the law and created a [termination] procedure that was Kafkaesque . . . .

. . . . [Godfrey & Kahn] demanded under the procedure that [Stone] provide his response to the misconduct allegation without ever giving [Stone] the misconduct allegation.

In this case, much akin to making an agreement with the devil, in this case [Stone] did, in fact, comply with the demands of Godfrey & Kahn and submitted . . . a rebuttal, or a letter, and he did so timely.

But the important thing is the only opportunity [Stone] had to respond in writing was a time when he had no idea what the charges were. And, again, all of this was being orchestrated by Godfrey & Kahn ostensibly under the law, and it was relied upon by Midwest.

. . . .

. . . . Godfrey & Kahn was orchestrating everything to do with this.

As the trial court's own words show, the court based its ruling entirely on what documents the court believed Godfrey & Kahn told Midwest to turn over to Stone prior to the August 4 Board meeting. The court did not mention Godfrey & Kahn's trial conduct at all.

¶ 36. Stone attempts to show that it was Godfrey & Kahn's trial strategy that prompted the trial court's sanction, but we are unpersuaded. Stone points to his

628

objection to Midwest's question to him during trial, and the trial court's remarks when sustaining that objection. Midwest asked Stone whether he strategically choose not to individually rebut each of the twelve allegations against him during the August 4 Board meeting, and Stone objected. The trial court, in sustaining the objection, remarked that Godfrey & Kahn had unfairly advised Midwest that it need not turn over all of the detailed statements of the complaining witnesses to Stone prior to the August 4 Board meeting. These remarks, Stone argues, show that the basis for the trial court's post-verdict sanction against Godfrey & Kahn was for its trial strategy.[7]

¶ 37. Stone's argument is unpersuasive because, first and foremost, the trial court never mentioned Godfrey & Kahn's trial strategy when sustaining the objection to Midwest's question during the trial. In fact, the trial court's remarks only mention Godfrey & Kahn's legal advice prior to the August 4 Board meeting, stating that Godfrey & Kahn, through its influence over Midwest, "chose not to give to [Stone], the information it had relative to the charges against him."

¶ 38. Second, the trial court did not sanction Godfrey & Kahn *during* the trial. If the fair administration

---

[7] Although not necessary to our decision, we also note that Stone's argument that Godfrey & Kahn's impeachment trial strategy was improper lacks support in the record. The record shows that each of the twelve allegations levied against Stone were contained in the Final Investigation Report, as were his summary responses to each allegation. The record also shows that Stone received a copy of the Final Investigation Report on August 1, three days before the August 4 Board meeting. Because Stone had access to the report days before the meeting, even though he was not given a copy of the Interview Summaries, it is unclear to us why it was improper to attempt to impeach Stone as Godfrey & Kahn did.

of justice was disrupted by Godfrey & Kahn's trial strategy, that is, by asking the objected-to question, as Stone argues, presumably the trial court would have immediately sanctioned Godfrey & Kahn for the question. The trial court's failure to do so clearly indicates that no conduct occurred that was impeding the trial court's ability to perform its function as a court. *See State v. Henley*, 2010 WI 97, ¶ 74, 328 Wis. 2d 544, 787 N.W.2d 350 (A trial court "should only invoke inherent power when such power is necessary to the functioning of the court.").

¶ 39. In sum, when issuing the sanction, the trial court made no mention of Godfrey & Kahn's behavior during trial or the firm's trial strategy. Rather, the record shows that the trial court focused exclusively on, what it believed to be, Godfrey & Kahn's legal advice prior to the August 4 Board meeting as the basis for the sanction.

¶ 40. Moreover, to the extent that Stone is arguing that Godfrey & Kahn's trial strategy, to wit, questioning Stone about his failure to rebut each of the twelve allegations against him during the August 4 Board meeting, was "disruptive to the administration of justice," and that the trial court meant to sanction Godfrey & Kahn for contempt of court, we note that the trial court lacked a legal basis for contempt. Contempt is defined, in relevant part, as intentional "[m]isconduct in the presence of the court which interferes . . . with the administration of justice . . . ." *See* Wis. Stat. § 785.01(1)(a). However, a trial court is limited in its ability to impose such a sanction in that it may only do so "immediately after the contempt of court," not almost a month later. *See* Wis. Stat. § 785.03(2). For all of these reasons, we conclude that the record shows the trial court's sanction was for Godfrey & Kahn's pre-litigation conduct.

630

## II. The trial court did not have the inherent authority to sanction Godfrey & Kahn for the law firm's supposed pre-litigation legal advice.

■

¶ 41. The trial court attempted to invoke its inherent authority to effectively and efficiently administer justice when it sanctioned Godfrey & Kahn, stating: "the Court orders, in the exercise of its discretion under case law and statutory law, and to penalize the conduct disruptive to the administration of justice in this case, that Godfrey & Kahn, SC, counsel and agent for Midwest, be fully and totally responsible for paying all of the plaintiff's legal bills and his costs." We conclude that the trial court was without inherent authority to sanction Godfrey & Kahn for conduct that supposedly occurred before the court's jurisdiction was invoked and which did not impede the court's ability to function or fairly administer justice.

■

¶ 42. "[Trial] courts have 'inherent, implied and incidental powers.' " *Henley*, 328 Wis. 2d 544, ¶ 73 (citation omitted). Inherent "powers are those that are necessary to enable courts to accomplish their constitutionally and legislatively mandated functions." *Id.* There are three areas in which the courts have generally exercised their inherent authority: "(1) to guard against actions that would impair the powers or efficacy of the courts or judicial system; (2) to regulate the bench and bar; and (3) to ensure the efficient and effective functioning of the court, and to fairly administer justice." *Id.* A trial court "should only invoke inherent power when such power is necessary to the functioning of the court." *Id.*, ¶ 74; *see also Braunsdorf*, 98 Wis. 2d at 580.

¶ 43. Certainly, a trial court has the inherent authority to sanction a party or its attorney for misconduct *during litigation* by ordering payment of the opposing party's attorney's fees and costs. *See Schultz v. Sykes*, 2001 WI App 255, ¶ 2, 248 Wis. 2d 746, 638 N.W.2d 604 (trial court has the inherent authority to order a party to pay the opposing party's attorney's fees and to dismiss a case for suborning perjury); *Schultz v. Darlington Mut. Ins. Co.*, 181 Wis. 2d 646, 650–53, 658–59, 511 N.W.2d 879 (1994) (trial court has the inherent authority to impose opposing party's costs on defendant's attorney for inappropriate comments in front of the jury during trial); *Schaefer v. Northern Assur. Co. of Am.*, 182 Wis. 2d 148, 162, 513 N.W.2d 615 (1994) (trial court "has 'inherent authority to sanction parties for failure to prosecute, failure to comply with procedural statutes or rules, and for failure to obey court orders' ") (citation omitted); *Jensen*, 275 Wis. 2d 604, ¶¶ 1–2, 33–35 (trial court has the inherent authority to impose attorney's fees and costs against the plaintiff's attorney for failing to obey the trial court's scheduling order); *Teubel v. Prime Dev., Inc.*, 2002 WI App 26, ¶¶ 16–17, 249 Wis. 2d 743, 641 N.W.2d 461 (WI App 2001) (trial court has the inherent authority to sanction an attorney for altering marked exhibits); *Johnson v. Johnson*, 199 Wis. 2d 367, 376–78, 545 N.W.2d 239 (Ct. App. 1996) (trial court has the inherent authority to sanction a party for overtrial).

¶ 44. However, here, as we set forth in some detail above, the trial court sanctioned Godfrey & Kahn for pre-litigation legal advice that the trial court believed that the law firm gave to Midwest. The trial court did not sanction Godfrey & Kahn for its conduct during litigation. The trial court never mentioned Godfrey & Kahn's conduct during the trial, the pleadings, or the pretrial scheduling orders.

¶ 45. The parties have not cited to any case, and our research has not revealed one, which suggests that the trial court has the inherent authority to sanction Godfrey & Kahn for conduct which occurred *before* the court's jurisdiction was invoked. But there is a well-established test in our Wisconsin jurisprudence for the inherent power to sanction: whether "such power is necessary to the functioning of the court." *Henley*, 328 Wis. 2d 544, ¶ 74. Whether it is ever possible for pre-litigation conduct to justify the exercise of inherent power is an issue we do not reach because it is not necessary to our decision. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶ 8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707. Here, the record is clear that the trial court's sanction for pre-litigation conduct does not comport with the three areas in which such authority is generally exercised: "to guard against actions that would impair the powers or efficacy of the courts or judicial system"; "to regulate the bench and bar"; and "to ensure the efficient and effective functioning of the court, and to fairly administer justice." *See Henley*, 328 Wis. 2d 544, ¶ 73.

¶ 46. Next, Godfrey & Kahn argues that the trial court denied the law firm due process when it issued the sanction without notice or a hearing to determine what legal advice Godfrey & Kahn gave Midwest during Stone's termination hearing and whether that advice caused Midwest's subsequent conduct. We need not reach the due process argument because we conclude that, based on the record, the trial court lacked the inherent authority to sanction Godfrey & Kahn for pre-litigation legal advice. *See Patrick Fur Farm, Inc.*, 286 Wis. 2d 774, ¶ 8 n.1.

¶ 47. In sum, we conclude that because the trial court lacked the inherent power to sanction Godfrey &

Kahn for its supposed pre-litigation conduct, the court acted outside its powers and without authority.

### III. A supervisory writ of prohibition is appropriate in this case.

¶ 48. "A supervisory writ is a blending of the writ of mandamus and the writ of prohibition."[8] *State ex rel. Dressler v. Circuit Court for Racine Cnty., Branch 1,* 163 Wis. 2d 622, 630, 472 N.W.2d 532 (Ct. App. 1991). A writ of "prohibition is used to prohibit an action that is contrary to a duty," Michael S. Heffernan, APPELLATE PRACTICE AND PROCEDURE IN WISCONSIN, ch. 10, § 10.2 (Jan. 2011), and is an extraordinary remedy, which will not issue unless the court acted without authority or without jurisdiction, *Drugsvold v. Small Claims Court for Dane Cnty.,* 13 Wis. 2d 228, 231–32, 108 N.W.2d 648 (1961) ("Generally, if the inferior court is acting in the proper exercise of its power and within its jurisdiction even though the court might have committed judicial error, the writ of prohibition would not lie."); *see also Kowaleski v. District Court of Milwaukee Cnty.,* 254 Wis. 363, 372, 36 N.W.2d 419 (1949), *overruled on other grounds by State ex rel. Jackson v. Coffey,* 18 Wis. 2d 529, 118 N.W.2d 939 (1963) ("The writ will not issue to prohibit a court from acting in the proper exercise of its powers and within its jurisdiction.").

---

[8] A writ of "mandamus is used to force the performance of a duty, whereas [a writ of] prohibition is used to prohibit an action that is contrary to a duty. The close relationship between the two writs is often recognized by petitions characterizing the relief sought . . . simply as 'supervisory' relief." Michael S. Heffernan, APPELLATE PRACTICE AND PROCEDURE IN WISCONSIN, ch. 10, § 10.2 (Jan. 2011).

¶ 49. A petitioner seeking a supervisory writ for prohibition must show that: (1) " 'the duty of the trial court is plain and it . . . intends to act in violation of that duty' "; (2) " 'grave hardship or irreparable harm will result' "; (3) " 'an appeal is an inadequate remedy' "; and (4) " 'the request for relief is made promptly and speedily.' " *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 17, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). "The decision whether to issue a supervisory writ 'is controlled by equitable principles and, in our discretion, we can consider the rights of the public and third parties.' " *Id.* (citation omitted).

¶ 50. We conclude that Godfrey & Kahn has demonstrated that an extraordinary remedy, to wit, a writ of prohibition, is necessary here.

### A. The trial court exceeded its authority to act.

¶ 51. As we set forth earlier in this decision, we conclude that the trial court clearly acted outside the proper exercise of its powers, *see Drugsvold*, 13 Wis. 2d at 232, and *State ex rel. Kowaleski*, 254 Wis. at 372, when it sanctioned Godfrey & Kahn for its supposed pre-litigation conduct. In the absence of inherent authority, entering a judgment memorializing that decision is prohibited by the law.

### B. The ethical considerations concerning Godfrey & Kahn's representation of Midwest had the trial court entered a written order or judgment amounted to a hardship and would have inflicted irreparable harm upon Midwest.

¶ 52. The trial court's ruling from the bench put Godfrey & Kahn in an ethical bind. In order to defend

itself against the trial court's accusations of improper pre-litigation conduct, Godfrey & Kahn would have had to reveal confidential communications with Midwest, which were protected by the attorney-client privilege, *see* WIS. STAT. § 905.03, and perhaps, as Godfrey & Kahn argues, the work-product doctrine, *see* WIS. STAT. § 804.01(2)(c). If the trial court had entered a judgment for attorney's fees against Godfrey & Kahn, Godfrey & Kahn's interests on appeal—to avoid a substantial money judgment—would directly conflict with Midwest's interests on appeal—to avoid the same substantial money judgment. *See* SCR 20:1.8. So long as no judgment or order was entered against it, Godfrey & Kahn, ostensibly, was free to continue its representation of Midwest. Had Godfrey & Kahn been forced to conclude its representation of Midwest due to these ethical considerations, Midwest would have been denied its counsel of choice and would have been forced to obtain new counsel unfamiliar with a case that had been ongoing for years. We conclude that these considerations imposed grave hardships upon both Godfrey & Kahn and Midwest and would have resulted in irreparable harm to Midwest, suggesting that a supervisory writ for prohibition, rather than an appeal, is the appropriate course of action in this case.

***C. An appeal or petition for leave to appeal a non final order is not available to Godfrey & Kahn.***

■

¶ 53. To be appealable, an order "must be in writing and filed." *Ramsthal Adver. Agency v. Energy Miser, Inc.*, 90 Wis. 2d 74, 75, 279 N.W.2d 491 (Ct. App. 1979); *see also Helmrick v. Helmrick*, 95 Wis. 2d 554,

556, 291 N.W.2d 582 (Ct. App. 1980) ("An oral ruling must be reduced to writing and entered before an appeal can be taken from it."). Here, the trial court did not enter a written order or judgment against Godfrey & Kahn from which it can appeal. As such, we conclude that an appeal or a petition to appeal from a nonfinal order are inadequate remedies, as neither is available to Godfrey & Kahn.

¶ 54. We recognize, however, that a written order from which Godfrey & Kahn can appeal has not been entered at our direction, as requested by Godfrey & Kahn. However, we conclude that the unique circumstances of this case, as demonstrated in more detail above, necessitated the order temporarily barring the trial court from entering a written order.

### D. Godfrey & Kahn promptly filed its petition for a supervisory writ of prohibition.

¶ 55. Godfrey & Kahn filed its petition for a supervisory writ of prohibition days after the trial court made its ruling from the bench, before the trial court even had time to enter a written judgment. No party argues that its petition was not promptly filed.

### E. Considering all equitable principles and exercising our discretion accordingly, we conclude that a writ of prohibition is appropriate under this unique set of facts.

¶ 56. A writ of prohibition is an extraordinary remedy which will not issue unless the court acted without authority or without jurisdiction. *Drugsvold*, 13 Wis. 2d at 231–32; *see also State ex rel. Kowaleski*, 254 Wis. at 372. That is exactly the case with which we are presented here. Given that the trial court clearly

exceeded its authority in ordering Godfrey & Kahn to pay the opposing party's attorney's fees for supposed pre-litigation conduct and that permitting the trial court to enter an order to that effect—and thereby enabling Godfrey & Kahn to file an appeal—would put an unnecessary hardship on both Godfrey & Kahn and Midwest, we conclude that a supervisory writ of prohibition is appropriate in this instance. *See Kalal*, 271 Wis. 2d 633, ¶ 17. Such " 'an extraordinary and drastic remedy' " is necessary given the unique circumstances of this case. *See id.* (citation omitted).

## CONCLUSION

¶ 57. In short, the trial court acted without authority when it sanctioned Godfrey & Kahn, and a writ of prohibition, preventing the court from memorializing its oral ruling, must issue. A trial court's inherent powers are well-established and based on ensuring that our courts have the power to fulfill their very important function. But here, because the trial court invoked its inherent power to sanction a law firm for behavior that was not before the court or in any way necessary to the trial or the court's ability to conduct its judicial business, it erred.

*By the Court.*—Writ granted.